UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

Tanya Marie Bey,                                    :
                                                    :
                      Plaintiff,                    :
                                                    :          **ORDER**
         -against-                                  :          21-CV-7832 (KHP)
                                                    :
Commissioner of Social Security,                    :
                                                    :
                      Defendant.                    :

---------------------------------------------------------------X

**KATHARINE H. PARKER, United States Magistrate Judge**.

Plaintiff Tanya Marie Bey, represented by counsel, commenced this action against

Defendant, Commissioner of the Social Security Administration ("SSA"), pursuant to the Social

Security Act ("Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of Defendant's decision that she

was not disabled as of January 6, 2020, the date of her application for Supplemental Security

Income benefits ("SSI"), and accordingly was not eligible for SSI on that date.[1]  Plaintiff and

Defendant both moved for judgment on the pleadings.  (ECF No. 18 ("Joint Stipulation").)  For

the reasons set forth below, the Court GRANTS Plaintiff's motion, and DENIES Defendant's

motion.

## BACKGROUND

Plaintiff was born in 1970 and has a ninth-grade education.  (ECF No. 3 (Administrative

Record ("A.R.")), 198, 226.)  She suffers from Bipolar I disorder with psychotic features,

schizoaffective disorder, and major depressive disorder.  She has been unemployed since at

least 2005.  Between 2005 and 2007, Plaintiff received social security disability benefits, but she

---

[1]  The alleged onset date for SSI is the date the application for benefits is filed, and benefits are limited to that date.

became ineligible for these benefits in 2007 following a settlement that resulted in Plaintiff receiving a sum of money.  (*Id.* at 36-37.)

On January 6, 2020, Plaintiff re-applied for SSI benefits in light of her mental health disorders.  (*Id.* at 75, 88, 198-207.)  Defendant denied Plaintiff's claim.  (*Id.* at 89-94.)  Plaintiff applied for reconsideration, and Defendant again denied the claim.  (*Id.* at 95-100.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held in October 2020.  (*Id*. at 101.)

1. **Relevant Medical Evidence**

   a. <u>Montefiore Medical Center</u>

Since at least 2013, Plaintiff has received mental health therapy and treatment from the Montefiore Medical Center ("Montefiore").  (*Id.* at 670.)  Plaintiff regularly visited Montefiore for stress reduction therapy with Desiree Jordon, L.M.S.W. ("Social Worker Jordon"), and for treatment from Nurse Practitioner Adam R. McGahee ("N.P. McGahee").  Thomas Beltzer, M.D., oversaw Plaintiff's prescriptions and medication management.

In the two years prior to Plaintiff's application for SSI benefits in January 2020, Plaintiff experienced symptoms of psychosis, including paranoid delusions that her family was against her, and severe changes in mood, depression, and mania.  (*Id.* at 290.)  Plaintiff was hospitalized multiple times in 2017 and 2018 because of psychotic episodes and suicide attempts.  (*Id.*)

During the period between applying for SSI benefits in January 2020 and the October 2020 hearing (the "Relevant Period"), Plaintiff's prescribed medications included Lexapro (generally prescribed to treat major depressive disorder and generalized anxiety disorder);

2

Haldol injections (generally prescribed to treat psychotic disorders); and Seroquel (generally prescribed to treat symptoms of schizophrenia and bipolar disorder). (*Id*. at 648-49; Joint Stipulation at 4.) N.P. McGahee explained that regular Haldol injections are necessary to maintain Plaintiff's mood and prevent psychosis. (A.R. at 290.)

During the Relevant Period, Social Worker Jordan and N.P. McGahee generally found Plaintiff to be well groomed and cooperative during outpatient treatment, and to display appropriate behavior, normal speech, logical thought process, fair insight and judgment, and good impulse control during treatment sessions. (*Id*. at 648, 652, 656, 660, 664, 885, 891, 896, 911, 916, 921.) Over this period, Plaintiff consistently reported that she was not suicidal or homicidal and that she was not experiencing hallucinations. (*Id*.) At times, the mental status exams found Plaintiff's mood to be anxious and her affect blunted or constricted. (*Id*. at 648, 652, 891, 921.) These exams also at times found her concentration and memory to be impaired. (*Id*.) Plaintiff's treating providers occasionally observed that her mood was "stable" and that her symptoms remained controlled with medication. (*Id*. at 650, 654, 885.)

At a January 9, 2020 therapy session with Social Worker Jordan, Plaintiff reported heightened anxiety due to her social security case, with a moderate response to treatment and moderate progress towards her goal of decreasing anxiety. (*Id.* at 646.) Plaintiff remained verbal and cooperative. (*Id*. at 647.) At a February 10, 2020 visit with N.P. McGahee, Plaintiff reported feeling "ok" and that her symptoms remained controlled with medication. (*Id*. at 650.) A mental status exam found a constricted affect, and fair insight and judgment. (*Id*. at 652).

On March 1, 2020, Social Worker Jordan found Plaintiff to have a calm mood, appropriate affect, and intact memory and cognition.  (*Id*. at 883).  On March 4, Plaintiff visited N.P. McGahee and reported that she was experiencing poor sleep and that she continued to feel stressed about her social security application.  (*Id*. at 654.)  Plaintiff was unable to perform the "serial sevens" clinical test, which asks the patient to count down from one hundred by sevens and is used to test cognition.  (*Id.* at 654.)  On March 6, 2020, Plaintiff attended therapy with Social Worker Jordan and reported that she was "doing much better emotionally" and that she was taking her medication.  (*Id*. at 658.)  Plaintiff also reported that she had felt depressed and tired with low energy.  (*Id.* at 660.)  Social Worker Jordan found that Plaintiff was making moderate progress towards decreasing her anxiety.  (*Id.* at 658.)  The mental status exam showed a calm mood, appropriate and full affect, and intact memory, cognition, concentration, and attention.  (*Id.* at 660).

On April 1, 2020, Plaintiff visited N.P. McGahee and stated that she was experiencing increased stress based on the outcome of her SSI application, but that the stress had not triggered manic or psychotic symptoms.  (*Id*. at 662-64.)  N.P. McGahee found Plaintiff to be in stable condition, with an anxious mood, fair insight, fair judgment, and intact concentration, memory, and attention.  (*Id*. at 664.)  On April 15, 2020, Plaintiff attended a telephonic therapy session with Social Worker Jordan to discuss her depressive symptoms.  (*Id.* at 885.)  Social Worker Jordan found her to be emotionally stable with a euthymic mood.  (*Id.* at 885, 887.)  Plaintiff returned for telephonic therapy on April 22, 2020 and reported that she was stressed about her SSI appeal.  (*Id.* at 889.)  A mental status exam revealed an anxious and irritable mood, impaired attention and concentration, and fair insight and judgment.  (*Id.* at 891.)

On April 30, 2020, N.P. McGahee completed a form titled "Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairment(s)." (*Id.* at 670-73.) He reported that Plaintiff's symptoms included appetite disturbance with weight change; mood disturbance; emotional lability; delusions or hallucinations; anhedonia or pervasive loss of interests; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; blunt, flat, or inappropriate affect; illogical thinking or loosening of associations; and manic syndrome. (*Id.* at 670.) N.P. McGahee reported that Plaintiff's mood "vacillated from sad to elevated" depending on "psychosocial factors." (*Id.* at 671.) He further reported that Plaintiff did not have a low I.Q. or low intellectual functioning. (*Id.*)

N.P. McGahee opined that Plaintiff had a "marked loss" of functioning (defined as a "substantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday") in her ability to (1) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (2) respond appropriately to changes in a routine work setting; and (3) set realistic goals or make plans independently of others. (*Id.* at 671-72.) He opined that Plaintiff would "often" experience deficiencies of concentration, persistence or pace, and would experience "repeated" episodes of deterioration or decompensation in work or work-like settings. (*Id.* at 673.) He further opined that Plaintiff had a "moderate loss" of functioning (defined as being able to sustain the activity for "up to 2/3 of an 8-hour workday") in her ability to (1) accept instructions and respond appropriately to criticism from supervisors; (2) maintain socially appropriate behavior; (3) adhere to basic standards of neatness or cleanliness; and (4) be aware of normal hazards and take appropriate precautions. (*Id.*) N.P. McGahee assessed that Plaintiff's impairments did not affect her ability

to understand, remember, or carry out instructions. (*Id*. at 671.) He opined that Plaintiff had no or only mild loss in interacting appropriately with the public, asking simple questions or requesting assistance, traveling to unfamiliar places, and using public transportation; and a slight loss of functioning in restrictions of activities of daily living. (*Id*. at 672-73). N.P. McGahee estimated Plaintiff would miss work about three times a month due to her impairments or treatment. (*Id.* at 671.)

At a May 29, 2020 telehealth visit with N.P. McGahee, Plaintiff reported depression triggered by ongoing financial strain related to lack of income and discussed experiencing difficulties in finding a job. (*Id*. at 896.) At an August 4, 2020 therapy session with Social Worker Jordan, Plaintiff reported that she was "doing okay," but that she was feeling tired, had little energy, and had trouble concentrating on things such as reading the newspaper or watching television. (*Id.* at 912.) At another therapy session on August 11, 2020, Social Worker Jordan conducted a mental status exam, which found that Plaintiff's attention and concentration were impaired. (*Id*. at 916.) At a September 16, 2020 therapy visit, Plaintiff reported that she was anxious due to her upcoming SSI hearing. (*Id.* at 919.) A mental status exam found an anxious mood, impaired short and long-term memory, and impaired attention. (*Id*. at 921.)

b.  <u>John Miller, Ph.D. – SSA Consultative Examining Psychologist</u>

On February 19, 2020, Dr. John Miller, SSA Consultative Examining Psychologist ("Dr. Miller") evaluated Plaintiff at the behest of the SSA. (*Id*. at 508.) Plaintiff reported that she is unable to work due to depression, and that she last worked in 2005 in a seasonal maintenance position for New York City Parks. (*Id.*) Plaintiff reported that she received a diagnosis for

bipolar disorder and schizophrenia in 1990; that she was psychiatrically hospitalized in 2006, 2017, and 2018; and that she receives regular outpatient treatment at Montefiore. (*Id.*) She reported symptoms of anxiety, panic attacks, disturbed sleep, loss of appetite, recurrent depressive episodes with crying spells, irritability, concentration difficulties, social withdrawal, occasional hopelessness, and memory deficits. (*Id.* at 508-09.) She also reporting having thoughts of suicide, although she denied having suicidal ideations over the prior two years. (*Id*.) Plaintiff denied having any manic symptoms. (*Id.*) She reported a history of drug abuse from 1985 until 2013, and a family history of mental illness. (*Id.* at 509.)

Dr. Miller's mental status exam found that Plaintiff was cooperative, well groomed, and intact to person, place, and time, with a dysphoric affect. (*Id.* at 509-10.) She had adequate social skills and maintained appropriate eye contact; her speech was fluent and clear; her thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia; her intellectual functioning was below average; and her insight and judgment were fair. (*Id*.) Dr. Miller noted that Plaintiff's attention and concentration were impaired due to emotional distress. (*Id.* at 510.) Dr. Miller conducted memory tests and noted that Plaintiff could immediately recall one out of three objects and could recall another one out of three objects after a delay. (*Id*.) He assessed that Plaintiff's memory was mildly impaired due to emotional distress. (*Id*.) Plaintiff reported that she dresses, bathes, and grooms herself, and is able to cook food, clean, manage money, and take public transportation. (*Id.* at 510-11.) She stated that her daughter does the household shopping and laundry. (*Id.* at 511.) She stated that her family relationships are variable, that she has one friend, and that she spends her days reading and watching television. (*Id.*)

Dr. Miller diagnosed Plaintiff with schizophrenia symptoms that were mostly controlled with treatment; major depressive disorder with anxious distress; cocaine use disorder in full remission; and cannabis use disorder.  (*Id*. at 511.)  He opined that Plaintiff was "markedly limited" in her ability to sustain concentration and perform tasks at a consistent pace; "moderately limited" in her ability to regulate emotions, control behavior, and maintain wellbeing; and "mildly limited" in her ability to sustain an ordinary routine and regular attendance at work.  (*Id.*)  He opined that Plaintiff was not limited in her ability to understand, remember, or apply directions and instructions; use reason or judgment to make work-related decisions; interact appropriately with supervisors, co-workers, and the public; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions.  (*Id.*)  Dr. Miller noted that Plaintiff's prognosis was "fair," and recommended that she continue with existing treatment.  (*Id.*)

c.    <u>Non-Examining State Agency Medical Consultants</u>

Two medical consultant psychologists retained by the SSA reviewed Plaintiff's treatment records to provide an opinion on her abilities – E. Kamin, Ph.D. ("Dr. Kamin") and S. Bhutwala, Ph.D. ("Dr. Bhutwala").

Dr. Kamin reviewed Plaintiff's file on March 6, 2020.  The file included Plaintiff's treatment records through December 2019 (but not treatment records from January 2020 through March 6, 2020), and included Dr. Miller's report.  (*Id.* at 71-72.)  Dr. Kamin opined that Plaintiff was "markedly limited" in her ability to maintain attention and concentration for extended periods.  He further opined that Plaintiff was "moderately limited" in concentration, persistence, or pace, and in her ability to understand, remember, and carry out detailed

instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from her symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting.  (*Id*.)  Dr. Kamin opined that Plaintiff had "mild" limitations in understanding, remembering, or applying information; interacting with others; adapting or managing herself; performing activities within a schedule; maintaining regular attendance and being punctual; being aware of normal hazards and taking appropriate precautions; setting realistic goals; and making plans independently of others.  (*Id*. at 69-71.)  He found no evidence of any limitation in her ability to understand and remember locations, work-like procedures, and short and simple instructions; carry out short and simple instructions; and travel to unfamiliar places or use public transportation.  (*Id.*)

Dr. Bhutwala reviewed the record on June 8, 2020.  (*Id.* at 85.)  At that time, the record included records through April 1, 2020.  (*Id.*)  Based on this updated evidence, Dr. Bhutwala agreed with Dr. Kamin's findings, except that he found that Plaintiff had "moderate" rather than "mild" limitations in understanding, remembering, or applying information, persisting, or maintaining pace; and that Plaintiff had "moderate" rather than "marked" limitation in her ability to maintain attention and concentration for extended periods.  (*Id.* at 82.)

   2. **Plaintiff's January 20, 2020 Function Report**

Plaintiff attested in a January 20, 2020 function report that she lives in an apartment with family and that on a typical day, she makes breakfast, takes her medication, and sleeps for much of the day because her medication makes her tired.  (*Id.* at 238.)  She also stated that she

has insomnia and takes Quetiapine at night to help her sleep.  (*Id.*)  She reported that she can

perform her own personal care, and can pay her bills, count change, and clean her apartment,

but she is "a little slow" at cleaning.  (*Id.* at 240, 242.)  She stated that she has limited ability to

stand or walk because she is "on the medication" and will get tired or "fall asleep."  (*Id.* at 243-

44.)  Plaintiff reported that her adult daughter helps her with grocery shopping and reading her

mail, and her daughter does most of the cooking because Plaintiff has forgotten the stove on

and burned the food.  (*Id.*)  Plaintiff stated that her hobbies include watching television and

playing games on her phone.  (*Id.* at 242.)  She stated that she only leaves the house every

three days, and when she goes out, she uses public transportation to go to doctor's

appointments, to visit family in New Jersey, and to go grocery shopping.  (*Id.* at 240.)  She

stated that she has some trouble getting along with others.  (*Id.* at 242, 245.)  She stated that

she can follow spoken but not written instructions, she has trouble remembering things, she

gets easily distracted, and stress causes her to "break down."  (*Id.* at 242, 244-45.)

### 3.  Hearing before the ALJ

On October 16, 2020, ALJ Flor Suarez conducted a telephonic hearing.  (*Id.* at 30.)

Plaintiff was represented by counsel at the hearing.  (*Id.*)  At the hearing, Plaintiff testified that

she is unable to work due to her mental illnesses.  (*Id.* at 40-41.)  She testified that she has

"episodes" that have resulted in psychiatric hospitalizations, and that she experiences "very

bad emotional problem[s]" and is "crying all over the place."  (*Id.* at 41, 43.)  Plaintiff stated

that she has "been fighting these demons for years."  (*Id.* at 41.)  She testified that she has a

"really big problem" with concentrating, and that she forgets things and sometimes "can't get

up." (*Id.* at 46.)  She acknowledged a history of drug abuse and stated that she has been sober since 2013.  (*Id.* at 49-50.)

Plaintiff testified that she goes to a behavior clinic every month for a Haldol injection and a "psych background," and that she takes oral medication every morning and night.  (*Id.*) She stated that she is starting to get used to her new medication regimen, but her medications cause side effects including "the shakes," dry mouth, forgetfulness, and difficulty concentrating.  (*Id.* at 41, 43.)  Plaintiff stated that the medication sometimes causes her to misplace things and "space out."  (*Id.* at 43.)  She stated that when she does not take her medication, she gets sick and enters a psychotic state.  (*Id.* at 41-42.)

As to Plaintiff's living situation and daily activities, Plaintiff testified that she lives in an apartment with her 21-year-old daughter who helps with household tasks and some personal grooming, and on a typical day, Plaintiff goes to church, reads the Bible, watches television, goes to her doctor's appointments, and goes to therapy.  (*Id.* at 39-40, 44.)  Plaintiff testified that she does not really socialize with people other than one girlfriend because she has difficulty trusting others.  (*Id.* at 44.)

Patricia Highgrove, a Vocational Expert ("VE"), also testified at the hearing.  The ALJ asked the VE whether there was any work in the economy for an individual of Plaintiff's age, education, and work history who was limited to simple and routine tasks that are consistent with Specific Vocational Preparation ("SVP") 1 and 2 jobs[2]; low stress jobs, defined as only occasional changes in the work setting; and no more than occasional interactions with the

---

[2]  An SVP 1 job is a job that can be learned through a short demonstration, and an SVP 2 job is a job that contains simple one- or two-step tasks that can be learned through a short demonstration over a period of at most 30 days.  (Joint Stipulation at 3.)

public, co-workers, and supervisors.  (*Id.* at 53.)  The VE testified that such an individual could

work as a hand packager, a cleaner, and a laborer, stores.  (*Id.* at 53-54.)  The VE testified that if

the individual would be off task for five percent of the day in addition to normal breaks, she

could still perform these jobs.  (*Id.* at 55.)  However, the VE testified that if the individual was

off task more than ten percent of the day or was late to work by 30 minutes on three occasions,

the person could not work.  (*Id.* at 56, 58.)

### 4.  The ALJ's Decision

On January 25, 2021, ALJ Suarez issued a decision finding Plaintiff was not disabled

within the meaning of the SSA over the Relevant Period and accordingly was not entitled to SSI.

(*Id*. at 7-27.)  The decision followed the established five-step sequential evaluation process for

determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since January 6, 2020.  (*Id*. at 12).  At step two, she determined that Plaintiff had severe

impairments of bipolar I disorder; schizoaffective disorder, bipolar type; and major depressive

disorder, and these impairments significantly limit Plaintiff's ability to perform basic work

activities.  (*Id*. at 13.)  At step three, the ALJ found that Plaintiff's impairments did not meet or

medically equal one of the listed impairments set forth in Appendix 1 of 20 C.F.R. Part 404,

Subpart P.  (*Id.* at 13-15.)  In making this finding, the ALJ first considered whether the paragraph

B criteria are satisfied.

To satisfy the paragraph B criteria, the impairments must result in one "extreme"

limitation or two "marked" limitations in any of the following four broad areas of functioning:

(1) ability to understand, remember, or apply information; (2) ability to interact with others;

(3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.

*See* 20 C.F.R. § 404.1520a.  The ALJ determined that Plaintiff has only "moderate" limitations in each of these four areas.  As to the first area—ability to understand, remember, or apply information—the ALJ noted that Plaintiff testified to having difficulty remembering information, but also noted that Plaintiff could perform household chores, take public transportation, shop, and play games; and that the record showed Plaintiff could follow instructions from healthcare providers and comply with treatment.  (*Id*. at 13.)  As to the second area—interacting with others—the ALJ noted that Plaintiff testified to struggling in this area, but on the other hand she was able to go out in public, socialize, attend church, and live with her daughter, and her treating providers found her to be cooperative with appropriate grooming, social skills, and eye contact.  (*Id.* at 13-14.)  Regarding the third area—ability to concentrate, persist, or maintain pace—the ALJ acknowledged Plaintiff testified to having trouble concentrating, completing tasks, and maintaining a schedule, but noted Plaintiff was able to cook, clean, and attend church, and her providers generally found her attention and concentration to be intact and her thought processes logical and goal-directed.  (*Id.*)  Finally, as to the fourth area—ability to adapt or manage herself—the ALJ recognized that Plaintiff has difficulty handling change and managing her mood but noted that Plaintiff manages her daily care and treatment records reflect she was cooperative and appropriately groomed.  (*Id.*)

Having determined that the paragraph B criteria were not satisfied, the ALJ next determined that the evidence failed to establish the presence of any paragraph C criteria,[3]

---

[3]  The paragraph C criteria are used to evaluate "serious and persistent" mental disorders, recognizing that mental health interventions may control the more obvious symptoms of such disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(1). To meet the paragraph C criteria, there must be a documented history of the existence of

because there was not evidence that Plaintiff has "marginal adjustment;" that is, "the evidence does not show that changes to the claimant's environment or increased demands of daily activities have led to exacerbation of the claimant's symptoms and signs and to deterioration in [her] functioning, to the level defined in the listing." (A.R. at 15.) The ALJ also noted that the SSA consultants did not conclude that Plaintiff's impairments equaled a listed impairment. (*Id.*)

The ALJ then turned to assessing Plaintiff's residual functional capacity ("RFC").[4] The ALJ considered Plaintiff's testimony, the medical record, and the medical source opinions in making this assessment. As to Plaintiff's testimony, the ALJ noted that Plaintiff alleged her disorders prevent her from working in any capacity on a sustained basis; that her symptoms include crying spells, impaired memory, difficulty concentrating, self-isolating, poor sleep, anxiety, loss of interest, low mood and energy, disorganization, poor judgment, and distraction; and that her medications cause forgetfulness. (*Id.* at 15-16.) The ALJ found that Plaintiff's impairments could reasonably be expected to cause these symptoms, but that Plaintiff's statements as to the intensity, persistence and effects of these symptoms were not entirely consistent with her testimony about her daily tasks or the medical records, which typically described her symptoms as an anxious mood, blunted affect, and impaired concentration and memory. (*Id.* at 16-17.)

The ALJ also weighed the medical opinion evidence. She noted Social Worker Jordan assessed that Plaintiff's medication side effects could "impact her ability to focus." (*Id.* at 18.)

---

the mental disorder over a period of at least 2 years, and evidence of both ongoing treatment/support that diminishes the relevant symptoms and "marginal adjustment," that is, a minimal capacity to adapt to changes in the claimant's environment or to new demands. *Id.* §§ 12.04(C), 12.15(C).

[4] The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

The ALJ agreed that Plaintiff's medication could have such effects but found that the medical evidence and Plaintiff's testimony as to her daily activities supported a finding that these effects would not prevent Plaintiff from working.  (*Id.*)

The ALJ also considered N.P. McGahee's opinions from the April 30, 2020 Medical Source Statement, and found the opinion only partially persuasive.  (*Id.* at 20-21.)  To the extent N.P. McGahee indicated a "marked" loss in Plaintiff's ability to get along with coworkers and peers, the ALJ found this opinion inconsistent with the evidence that Plaintiff could use public transportation and attend social activities and church and that Plaintiff routinely presented as cooperative with appropriate behavior during outpatient treatment.  (*Id*. at 21.) To the extent N.P. McGahee found that Plaintiff had "no to mild limitations" interacting with the public, the ALJ found this understated Plaintiff's limitations, because Plaintiff testified to struggling socially, including losing a job because of difficulty getting along with a supervisor. (*Id.*)  The ALJ determined that Plaintiff's limitations in interacting with others are "moderate." (*Id.*)  The ALJ also found N.P. McGahee's opinion that Plaintiff would miss work approximately three days per month only partially persuasive because Plaintiff testified that she is able to manage daily tasks and she reported feeling good with medication management and because Plaintiff was not psychiatrically hospitalized during the Relevant Period.  (*Id.* at 19.)

ALJ Suarez also discussed Dr. Miller's and Dr. Kamin's opinions that Plaintiff had a "marked" limitation in her ability to sustain concentration and perform a task at a consistent pace.  The ALJ found these opinions only partially persuasive because Plaintiff's treating providers often found her concentration to be intact and because Plaintiff testified to managing

daily tasks that require concentration such as reading.  (*Id.* at 19.)  The ALJ determined that

Plaintiff had only moderate limitations in concentrating, persisting, and maintaining pace.

The ALJ determined that Plaintiff retained the RFC to perform a full range of work at all

exertional levels but with the following non-exertional limitations: (i) Plaintiff is limited to

simple and routine tasks consistent with SVP 1 or 2 jobs; (ii) Plaintiff is limited to work in a low

stress job, defined as having only occasional changes in the work setting; (iii) Plaintiff is limited

to work involving no more than occasional interactions with the public, co-workers, and

supervisors; and (iv) Plaintiff's work must allow her to be off-task approximately five percent of

the workday, in addition to regularly scheduled breaks.  (*Id*. at 15.)

At step four, the ALJ found that Plaintiff did not have any past relevant work.  (*Id.*)  At

step five, she considered Plaintiff's vocational factors along with her RFC to conclude that

Plaintiff could make a successful adjustment to work existing in significant numbers in the

national economy, including as a hand packager, cleaner II, and laborer, stores, as identified by

the VE.  (*Id*. at 22-23.)  Applying the framework set forth in Medical-Vocational Guideline

204.00, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that Plaintiff was not

disabled during the Relevant Period and therefore denied her benefits claim.  (*Id.* at 21-22.)

### 5. Appeal of the ALJ's Decision and Initiation of the Instant Action

Plaintiff requested the Appeals Council review the ALJ's decision on February 17, 2021.

(*Id*. at 195-97).  The Appeals Council denied the request for review on July 29, 2021.  (*Id*. at 1-4).

Accordingly, the ALJ's decision was the final decision of the Commissioner.  Plaintiff

commenced this action on September 20, 2021 asserting that ALJ Suarez failed to properly

evaluate the medical opinion evidence and Plaintiff's subjective allegations in determining Plaintiff's RFC.

## LEGAL STANDARDS

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record. *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted). The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination." *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). Once the court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the court then assesses the Commissioner's conclusions. In doing so, the court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record," and (2) "were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation omitted).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B). The ALJ's decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." *Id*. § 405(b)(1). It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is

supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5
(S.D.N.Y. Oct. 21, 2021) (citation omitted).

That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur
v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of
medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  If the ALJ fails to
consider evidence in the record, the Court must be "able to look to other portions of the ALJ's
decision and to clearly credible evidence" to find that the determination was supported by
substantial evidence.  *Mongeur*, 722 F.2d at 1040 (citation omitted).  If the Commissioner's
findings are supported by substantial evidence, those findings are conclusive.  42 U.S.C.
§ 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner is required to conduct a sequential
five-step inquiry to determine: (1) whether the claimant is currently engaged in any substantial
gainful activity; (2) if not, whether the claimant has a "severe impairment" that limits their
ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the
regulations, and what the claimant's RFC is; (4) if the impairment does not qualify as a listed
impairment, whether the claimant possesses the RFC to perform their past work; and (5) if the
claimant is not capable of performing past work, whether they are capable of performing other
work that exists in the national economy.  *Vellone v. Saul*, 2021 WL 319354, at *5 (S.D.N.Y. Jan.
29, 2021), *report and recommendation adopted sub nom. Vellone on behalf of Vellone v. Saul*,
2021 WL 2801138 (S.D.N.Y. July 6, 2021).  The claimant bears the burden of proof at the first
four steps of the analysis, and at the last step, the Commissioner has the burden to show there
is other work the claimant can perform.  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

18

When considering the medical opinions, the Commissioner must consider five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions.  *Id*. §§ 416.920a, 416.920c(b)(2).  The supportability inquiry focuses on how well a medical source supported and explained their opinion.  *Vellone,* 2021 WL 319354, at *6.  The question of consistency concerns whether the opinion is consistent with other evidence in the medical record.  *Id.*  The Commissioner is tasked with analyzing medical opinions at the source-level, meaning the Commissioner need not discuss each medical opinion in the record, and may apply the five factors holistically to a single medical source.  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).  Regarding claims filed on or after March 27, 2017, in evaluating the medical evidence, the Commissioner need not assign particular evidentiary weight to treating physicians as was previously required by the Act.  *Vellone*, 2021 WL 319354, at *6.  However, the regulations continue to recognize the "foundational nature" of the observations of treating sources.  *Steven M.W. v. Comm'r of Soc. Sec.*, 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022), *report and recommendation adopted sub nom.*, *Washburn v. Comm'r of Soc. Sec.*, 2022 WL 2669296 (S.D.N.Y. July 11, 2022).

## DISCUSSION

As an initial matter, the Court finds that ALJ Suarez provided Plaintiff with a full and fair hearing under the Secretary's regulations and completely developed the administrative record.  Accordingly, the Court turns to Plaintiff's contentions that the ALJ failed to properly evaluate the medical opinion evidence and Plaintiff's allegations in assessing Plaintiff's RFC.

1. **The ALJ <u>Erred</u> in Determining Plaintiff had only "Moderate" Limitations in Concentrating, Persisting, and Maintaining Pace.**

The ALJ determined that Plaintiff had only moderate limitations in her ability to maintain concentration and attention, persist, and maintain pace.  In making this determination, the ALJ found unpersuasive or only partially persuasive four medical opinions (from two treating providers and two SSA consultative psychologists) and relied entirely on the opinion of one non-examining SSA consultative psychologist and on what the ALJ described as the objective medical evidence.  In particular, the ALJ discounted LMSW Jordan's assessment that Plaintiff's medications could impact Plaintiff's ability to focus and complete tasks; N.P. McGahee's assessment that Plaintiff "often" experiences deficiencies of concentration, persistence, or pace and that she had a "marked loss" in her ability to sustain work activities; Dr. Miller's opinion that Plaintiff had a "marked" limitation in her ability to sustain concentration and maintain pace; and Dr. Kamin's opinion that Plaintiff had a "marked" limitation in her ability to maintain attention and concentration for extended periods.  The ALJ determined that none of these opinions was entirely persuasive, and instead found that Plaintiff's "mostly normal" treatment records and her testimony as to her daily activities supported a finding that Plaintiff has only moderate limitations in this area.

In reaching this determination, the ALJ committed procedural error by failing to discuss the supportability or consistency factors of these medical source opinions.  As to supportability, the ALJ did not discuss the supporting explanations presented by the medical sources for their opinions, and most notably, she failed to take into account the fact that Social Worker Jordan, N.P. McGahee, and Dr. Miller reached their opinions after examining the Plaintiff – a factor that

bears on supportability.  *See Rivera v. Comm'r of Soc. Sec.*, 2022 WL 3210441, at *12 (S.D.N.Y.

Aug. 9, 2022) (ALJ erred in failing to accord proper weight to the supportability of medical

source's opinion in light of the fact that the source was plaintiff's treating provider).

     As to consistency, the ALJ assessed that these opinions were not consistent with

Plaintiff's testimony that she is able to prepare meals, watch television, read, play games,

manage funds, and attend church.  (A.R. 18.)  However, in reaching this determination, the ALJ

misstated Plaintiff's testimony as to her abilities and cherry-picked from the record.  Plaintiff

did not testify that she is able to prepare meals; to the contrary, she stated that her daughter

helps with all the cooking because Plaintiff has previously left the burner on and burned the

food.  (*Id.* at 240.)  Additionally, Plaintiff did not testify that she is able to concentrate while

watching television, playing games on her phone, or while at church.  To the contrary, Plaintiff

testified that she is "not very good with just sitting down and just paying attention on one

thing," and she asserted that she sleeps for most of the day due to medication side effects.  (*Id.*

at 46.)  Plaintiff also testified that she has a "really big problem" with concentrating, and that

sometimes she "can't get up."  (*Id.* at 46.)

     Moreover, the ability to perform activities such as cooking, cleaning, reading, watching

television, and playing cell phone games does not amount to the ability to concentrate for an

extended period, and is not inconsistent with a marked limitation in maintaining concentration,

attention, and pace at work.  *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17,

2022) (finding that although the plaintiff engaged in activities "such as reading and playing

games on her phone, these activities did not show that [she] could hold down a steady job for

an extended period of time"); *see also Carrier-Titti v. Astrue*, 2009 WL 1542553, at *10

(N.D.N.Y. June 1, 2009) ("Performing simple daily activities, such as dusting, doing small loads of laundry, bathing and grooming one's self, . . . does not necessarily prove a claimant can perform regular work activity.").  Accordingly, the ALJ erred in evaluating and discussing the medical evidence.

The ALJ also found the four medical opinions inconsistent with treatment records showing that Plaintiff could manage simple calculations and memory tests and with mental status exam findings that she had "intact" concentration and cognition.  However, in the context of mental illness, the Second Circuit has repeatedly cautioned against relying on mental status exams to draw conclusions about a patient's abilities.  *See, e.g.*, *Loucks*, 2022 WL 2189293, at *2 (explaining that mental status exams only reveal the patient's mental state "at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time"); *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 11 (2d Cir. 2020) (finding it improper to rely on mental status evaluations to conclude that the plaintiff was capable of prolonged concentration while "ignoring the contrary conclusion of the very physicians who made the evaluations").  In finding that mental status exam results contradicted four medical source opinions, the ALJ incorrectly "imposed her own notion and medical judgment" over those of the medical experts.  *Diaz v. Comm'r of Soc. Sec.*, 2022 WL 16715920, at *5 (E.D.N.Y. Nov. 4, 2022) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)) (finding the ALJ erred in relying on mental status exams showing intact memory, concentration, and attention in discounting a medical opinion that the plaintiff had a marked limitation in his ability to maintain concentration and attention).  She also overlooked substantial portions of

the treatment record that found Plaintiff's attention and concentration to be impaired as well

as treatment notes stating that Plaintiff complained of being tired and having low energy.

The ALJ's errors were not harmless because a finding of a marked limitation in

concentration, attention, and pace would likely result in a revised RFC that might impact

whether there are any jobs in the economy that Plaintiff can perform.  For example, Plaintiff's

current RFC provides the limitation that her job must allow her to be off-task for five percent of

the workday.  It is unclear how the ALJ calculated that percentage, but if Plaintiff is found to

have marked limitations in her ability to persist and maintain pace, her RFC should reflect a

higher percentage of off-task time.  *See Krystle H. v. Comm'r of Soc. Sec.*, 2022 WL 888225, at

*7 (N.D.N.Y. Mar. 25, 2022) (explaining that a conclusion that the plaintiff would be off task for

more than 15 percent of the workday is consistent with a marked limitation in concentration).

At Plaintiff's hearing, the VE testified that an individual in Plaintiff's position who is off-task

more than ten percent of the day cannot work.  (A.R. 56.)  Similarly, the RFC currently provides

that Plaintiff can perform work at "all exertional levels," despite evidence in the record that she

has low energy, is often tired, and has difficulty maintaining pace.  This RFC may need to be

revised after a full analysis of the record.

> **2. The ALJ Erred in Finding Plaintiff Would Not Be Absent from Work Three Times Per Month.**

The ALJ determined that there was no evidence in the record to support a finding that

Plaintiff would be absent from work approximately three days per month.  (*Id.* at 21.)  In

making this determination, the ALJ found unpersuasive N.P. McGahee's opinion that Plaintiff

has a marked loss in her ability to sustain work activities and that she would miss work

approximately three days per month.  (*Id.* at 671.)  The ALJ explained that she did not find this opinion to be supported by the "clinical outpatient findings," and specifically because "the claimant[] was not psychiatrically hospitalized in 2019 or 2020 for paranoia or hallucinations." (*Id.* at 21.)

The ALJ did not adequately discuss the supportability of this opinion.  In particular, the fact that N.P. McGahee was Plaintiff's treating provider is an "important" factor in assessing the supportability of his opinion.  *Steven M.W.*, 2022 WL 2669491, at *6.  This is especially true in the context of mental illness, where objective medical evidence is typically lacking.  *Id.*  Because N.P. McGahee is the only medical source to render an opinion regarding Plaintiff's anticipated absenteeism, it is especially noteworthy that the ALJ did not discuss the supportability of this opinion.

The ALJ also did not appropriately discuss the consistency of this opinion with the record.  While she noted a handful of items in the record that purportedly contradict the opinion, the ALJ failed to mention and explain her reason for discounting the evidence in the record that supports the opinion.  Although the ALJ found it relevant that Plaintiff was not psychiatrically hospitalized in 2019 or 2020, she did not explain why such a lack of hospitalizations over this period of time contradicts N.P. McGahee's opinion, particularly in light of other evidence discussed above about the frequency Plaintiff leaves her home and her ability/inability to do so.  This error is meaningful because Plaintiff's impairments relate to mental health, and therefore are likely to be "episodic in nature."  *Id.* (citations omitted).  The fact that Plaintiff avoided hospitalization in 2019 and 2020 thus does not necessarily support the conclusion that she will not experience down periods (including potential hospitalizations),

or that she will not need frequent medical treatment to avoid becoming psychotic and will not suffer medication side effects moving forward that would impact her attendance. *See Loucks*, 2022 WL 2189293, at *2 (finding the ALJ erred by focusing on treatment notes over the relevant period and ignoring evidence of serious psychological symptoms outside the period); *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (stressing the importance of reviewing the longitudinal record in mental impairment cases).

As noted above, Plaintiff testified that she sleeps for most of the day, only leaves her house every three days, has periods of crying spells, and has severe emotional issues. (A.R. 11.) The treatment records reveal that Plaintiff has consistently informed her providers of these symptoms and others over the course of the Relevant Period. These symptoms could reasonably be expected to prevent Plaintiff from maintaining good workplace attendance. However, the ALJ determined that Plaintiff overstated these symptoms because Plaintiff's treatment notes occasionally reported that Plaintiff felt "good" and had a "stable" mood. In making this determination, the ALJ again placed an inappropriate reliance on treatment records and findings from "the time of the examination" while ignoring symptoms Plaintiff testified to experiencing "outside of that brief period of time" and consistently reported over a longer period of time. *Loucks*, 2022 WL 2189293, at *2. Indeed, "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and . . . it is error for an ALJ to pick out" and rely on "a few isolated instances of improvement." *Estrella*, 925 F.3d at 97. The ALJ incorrectly discredited Plaintiff's testimony and disregarded Plaintiff's more serious symptoms in determining Plaintiff's ability to maintain regular attendance at work.

As also noted above, the ALJ did not discuss the fact that Plaintiff must visit with her providers regularly to receive essential medication and therapy.  The requirement to attend regular medical appointments may contribute to anticipated absences.  *See Laracuente v. Colvin*, 212 F. Supp. 3d 451, 466-67 (S.D.N.Y. 2016) (ALJ erred in not considering the frequency of the plaintiff's medical treatment in determining that she would not be absent from work more than three days per month).  It is not clear whether the ALJ considered this factor here.   The ALJ's failure to address relevant evidence bearing upon the question of Plaintiff's attendance amounts to legal error.  *See April L.K. v. Comm'r of Soc. Sec.*, 2022 WL 832026, at *5 (S.D.N.Y. Mar. 21, 2022).

These errors are not harmless because the VE testified that a person in Plaintiff's position who is late or absent more than three times per month cannot work.  (A.R. at 58.)

3.  **The ALJ <u>Erred</u> in Determining Plaintiff had only "Moderate" Limitations in Interacting with Coworkers.**

The ALJ determined that Plaintiff had only moderate limitations in "interacting with others."  (*Id.* at 19.)  In making this determination, the ALJ found only partially persuasive the opinion of Plaintiff's treating provider, N.P. McGahee, that Plaintiff had a marked limitation in her "ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes."  (*Id.* at 21.)  The ALJ explained that she did not find this opinion persuasive because Plaintiff "is able to use public transportation and attend social activities and church" and because Plaintiff "routinely presented as cooperative with appropriate behavior during outpatient treatment."  (*Id.*)  The ALJ described Plaintiff as able to "spend time with friends and family" and "live with others."  (A.R. 13, 21.)  The ALJ also noted that N.P. McGahee

opined that Plaintiff had only mild loss in interacting appropriately with the general public and the consultative psychologists opined that Plaintiff had only mild limitations in interacting with others.

In discounting N.P. McGahee's opinion as to Plaintiff's limitation in interacting with coworkers, the ALJ committed two distinct errors. As an initial matter, she misstated Plaintiff's testimony and cherry-picked from the record. Plaintiff did not testify that she spends time with friends and family, successfully attends social events, or lives successfully with others. Rather, Plaintiff testified that she has difficulty socializing with others, she has only *one* friend who she occasionally speaks to over the phone, and she lives with *one* other person – a young adult daughter who provides necessary care to Plaintiff. (*Id.* at 44.) Plaintiff also testified to experiencing difficulty engaging in social activities and dealing appropriately with authority and that she has lost a job because of problems getting along with people. The ALJ inappropriately relied on Plaintiff's purported "social activities" without crediting the fact that Plaintiff struggles through the limited social interactions in which she engages. *See Gainous v. Comm'r of Soc. Sec.*, 2021 WL 4847071, at *5 (S.D.N.Y. Oct. 18, 2021) (ALJ impermissibly cherry-picked from the record by referring to plaintiff's attendance at social events without discussing that the plaintiff struggled to make friends at these events).

Second, the ALJ's analysis of N.P. McGahee's opinion as to Plaintiff's ability to interact with coworkers, as separate from the general public and supervisors, was lacking in required nuance. "[T]he public, supervisors, and co-workers are distinct groups," and should be separately addressed by the Commissioner in determining a claimant's mental RFC. *Janita H. v. Comm'r of Soc. Sec.*, 2023 WL 196158, at *8 (S.D.N.Y. Jan. 17, 2023) (citation omitted). While

N.P. McGahee and the SSA consultants all found that Plaintiff was generally able to interact with the general public, N.P. McGahee opined that Plaintiff would likely struggle to interact with *coworkers* specifically.  In assessing Plaintiff's RFC, the ALJ did not separately consider these three distinct groups and did not provide any explanation for why the three groups should not be treated distinctly despite N.P. McGahee's opinion that Plaintiff would have particular difficulty interacting with coworkers, and Plaintiff's testimony that she has had issues with coworkers in the past.  This error is especially pertinent in light of the fact that the evidence the ALJ cited in support of a finding that Plaintiff did not have a marked limitation in this area all concerned Plaintiff's interactions with the general public rather than interactions with coworkers.  It is not clear from the ALJ's decision whether she considered that Plaintiff might have particular issues with coworkers that are not reflected in Plaintiff's ability to interact with the general public.

These errors were not harmless because a finding that Plaintiff might have particular issues interacting with coworkers may warrant further limitations to her RFC.  *See Janita H.*, 2023 WL 196158, at *7 (holding that the ALJ erred when it added a limitation to plaintiff's RFC regarding interaction with coworkers but failed to consider or add limitations with respect to supervisors or the public); *Bonilla Mojica v. Berryhill*, 397 F. Supp. 3d 513, 537 (S.D.N.Y. 2019) (ALJ appropriately accounted for the plaintiff's problems interacting with others by limiting her to no face-to-face interaction with the general public, even though the plaintiff took public transportation, goes grocery shopping, and spends time with her children).  In the event Plaintiff's RFC is limited to no interaction with coworkers (rather than occasional interaction), it is possible that this will further limit the number of jobs in the economy that she could work.

**CONCLUSION**

For the reasons stated above, Plaintiff's motion for judgment on the pleadings is

GRANTED and Defendant's motion for judgment on the pleadings is DENIED.  This case is

remanded for reconsideration by the ALJ consistent with this opinion.

**The Clerk of the Court is respectfully directed to enter a final judgment remanding the case**

**and to close the case.**

**SO ORDERED.**

Dated: January 30, 2023
      New York, New York

                                              _____

                                              KATHARINE H. PARKER
                                              United States Magistrate Judge